In re Milton W. SCHAEFFER, Respondent.

No. 58788.

Supreme Court of Missouri, En Banc.

Dec. 8, 1975.

Sheldon D. Grand, Clayton, Mo., for informants.

Bernard Steinger, Clayton, Mo., for respondent.

FINCH, Judge.

This is an original proceeding initiated by the Bar Committee of the Twenty-First Judicial Circuit pursuant to Rule 5[1] seeking disbarment or discipline of respondent.

An information, filed following formal hearings by the Bar Committee, charges respondent with violating Rule 4 and particularly DR 1–102(A)(3), DR 1–102(A)(5) and 1–102(A)(6) thereof in that he violated § 210.211,[2] by acting as a "child placing agency" (as defined in § 210.201(3)) and by holding himself out as such an agency without being licensed to so act. Respondent filed an answer to the information after which a master was appointed, hearings were held and the master has now filed his report.

The testimony discloses that in August 1971 Mrs. Helen Corbin and her then

---

1. All references to rules are to Supreme Court Rules V.A.M.R.

2. All statutory references are to RSMo 1969 unless indicated otherwise.

unmarried, pregnant 16 year old daughter Debra conferred with Bruce Nangle, a St. Louis attorney, with reference to their problem. They discussed several possibilities, including getting the purported father to marry the girl or having the child put up for adoption. Mrs. Corbin indicated dissatisfaction with a public social agency which she had consulted about adoption. Mr. Nangle advised that he had little experience in this field and suggested referring them to someone more knowledgeable. He then suggested respondent Schaeffer with whom Nangle had once shared an office because he knew Schaeffer had done considerable work of that nature.

At the initial conference in respondent's office, attended by Mrs. Corbin, her daughter, Nangle and respondent, the possibility of adoption was discussed. Respondent advised that there were social agencies, public and private, through which the Corbins could go in order to place the child for adoption, but the Corbins replied they did not want to follow that course. In addition to dissatisfaction with the agency they had contacted, Mrs. Corbin, according to respondent, did not want the baby placed in St. Louis County for fear that the family of the father might try to obtain custody of the child. The respondent then advised that if they decided not to go through an agency, he could arrange with an attorney in Illinois who could arrange for and handle an adoption. They were sent home to think about the matter and were to advise if they wanted to proceed along those lines.

Thereafter, in subsequent conferences, the Corbins requested respondent to proceed as he had suggested. He then contacted Frederick Merritt, an Illinois attorney with whom he had had numerous social and business contacts over a number of years, about as to whether he had clients who were prospective adoptive parents. Merritt advised Schaeffer that he had a couple interested in adopting the child when born.

Accordingly, he prepared and sent to Schaeffer consents to adoption and entries of appearance to be executed by Mrs. Corbin and her daughter. Merritt requested that the child be born in Illinois and he advanced funds to Schaeffer to be used for medical and hospital expenses. Schaeffer then arranged to have the child born in Granite City, Illinois in St. Elizabeth's Hospital. Thereafter, pursuant to instructions from the doctor, Debra entered the hospital where her child was born on October 12, 1971. The plan contemplated that Debra and the child were to be discharged from the hospital on Sunday, October 17, that she was to walk from the hospital across the street to the doctor's office where she was to deliver custody of the child to respondent. He, in turn, was to turn the child over to the prospective adoptive parents out of Debra's presence since their identity was not to be revealed to her. The adoption proceedings were to follow, handled entirely by Merritt.

After the birth of the child, Debra decided that she wanted to retain her baby instead of putting him up for adoption, and on Saturday, October 16, Mr. and Mrs. Corbin appeared at the hospital for the purpose of taking Debra and her baby home. The hospital objected to their departure until respondent was summoned. On arrival, respondent strenuously objected to the change in plans and stated that the prospective adoptive parents would not pay the doctor or hospital bills if they did not receive the baby for adoption. Arguments ensued, but ultimately Mr. and Mrs. Corbin signed a note promising to pay the hospital's bill, and they then took Debra and the baby and left the hospital. Thereafter, on two occasions, Schaeffer called the Corbin home and talked to Debra as to whether she had changed her mind about keeping the baby. Debra advised that she had not. Shortly thereafter, respondent sent Mrs. Corbin a bill for $500.[3] Subsequently, she

3. Originally, Schaeffer advised Mrs. Corbin that his retainer fee would be $100, but it

had not been paid. Schaeffer testified that in proceedings of this kind, he customarily

filed with the Bar Committee a complaint with respect to the conduct of respondent. An investigation followed, culminating in this proceeding.

With certain exceptions not here pertinent, § 210.211 makes it unlawful for any person to act as a child placing agency or to hold himself out as such without obtaining a license to so act from the division of welfare. A "child placing agency" is defined in § 210.201(3) as " * * * any person who advertises or holds himself out as placing or finding homes for children * * * or who causes, or assists in causing, the adoption or change in possession or custody of one or more children, for compensation or otherwise."

Even assuming applicability of § 210.211 to respondent, the charge that he acted as a "child placing agency" by causing or assisting in causing a change in possession or custody of the Corbin baby was not sustained because there was no change in possession or custody. The master so concluded and we agree.

The second charge that "(s)ince approximately August 1971, respondent did and still does hold himself out as being able to find children for adoption and did and does direct, guide and assist efforts to cause a change in the possession or custody and the subsequent adoption of children, thereby acting as a 'child placing agency' * * * " presents a more difficult question, namely, the scope of § 210.211 and whether it is applicable to actions of an attorney in representing a client in adoption or change of custody cases.

■ Various exceptions in which a license from the division of welfare is not required are spelled out in § 210.211. One such exception is a person related to the child involved. For example, the mother of the child may transfer custody of her child,

in Missouri, provided she complies with the requirements of § 453.110 by filing a petition in the juvenile court. Usually, the mother would employ a lawyer to prepare the petition and assist her in arranging for the transfer of custody. Would the lawyer, not specifically listed as an exception in § 210.211, and not licensed by the division of welfare, violate § 210.211 by rendering legal services to the mother? We conclude not. As counsel herein point out, there apparently are no cases construing § 210.-211 or similar statutes with reference to whether they apply to an attorney acting as such in an adoption proceeding under applicable statutes. We assume that is true because it seems inconceivable that legislative bodies, in adopting statutes such as § 210.211, intended to brand as a crime the usual and necessary practice of having an attorney handle such adoption proceedings. This is not to say that a person who is an attorney may not unlawfully hold himself out as a "child placing agency" in violation of § 210.211. It does mean that a lawyer is not required to be licensed by the division of welfare to permit him to render regular legal services in connection with adoption proceedings.

In this case respondent was not employed by the Corbins on the basis that he held himself out as a "child placing agency". He was brought into the case because Bruce Nangle, the attorney originally consulted by the Corbins, knew him and knew of his experience in such matters while they officed together.

■ After respondent was employed, he contacted attorney Merritt in Illinois and, on being advised that Merritt had clients who would like to adopt the baby, made arrangements for Merritt to proceed with plans for adoption proceedings in the Illinois courts after the baby was born. Merritt testified that the procedure which was

was paid a fee by the adopting parents through Merritt at the conclusion of the adoption, the fee ranging from $300 to $500. Mrs. Corbin testified that she was not aware

of this arrangement. Such fee was not paid Schaeffer in this case since the adoption did not occur.

to be followed was authorized in Illinois and the Bar Committee has not suggested otherwise in its brief or argument. This evidence does not sustain the charge that "(s)ince approximately August 1971, respondent did and still does hold himself out as being able to find children for adoption and did and does direct, guide and assist efforts to cause a change in the possession or custody and the subsequent adoption of children, thereby acting as a 'child placing agency' * * * " in violation of § 210.211. It does not show that respondent did other than render advice and permissible services to his clients.

In the course of his testimony with reference to the Corbin matter, respondent testified that in years prior to the Corbin incident, he had handled similar private placements with lawyers in Illinois, Ohio and New York, and from time to time he had had calls from other lawyers around the country with reference to handling such matters. He stated that some people had offered substantial sums if he would search out a baby, but that he had never participated in such efforts and had not and would not participate in the selling of babies. No other details or specifics as to these earlier transactions with out-of-state lawyers were given or inquired about.

It is urged that it would strain credulity to the utmost to believe that lawyers from distant states would seek out respondent in such matters "unless he had held himself out and became known as one who could place or find homes for children, and who assisted in causing their change of custody." Consequently, says the Bar Committee, we should hold that respondent violated § 210.-211 and thereby violated certain canons contained in Rule 4. The master so recommended. However, it is our conclusion that, on the basis of this very general testimony, completely lacking in any details as to what respondent did in those instances, or who the attorneys were, or how they knew of respondent, we cannot hold that he thereby violated § 210.211 or canons relating to professional responsibility.

Respondent's brief suggests that his actions in dealing with the Corbins at the hospital and subsequently may show poor taste and bad judgment on his part, but not professional misconduct. We agree. His conduct on those occasions is to be deplored. In addition, there was testimony by Mrs. Corbin that she was not told and did not know that respondent was to have been paid a fee by the adopting parents if the adoption had been consummated. Since it was not, no fee was received by respondent from the persons who proposed to adopt the baby, but obviously, it would have been improper for respondent to have received a fee in this matter from others than his clients, the Corbins, without their knowledge and approval.

Having concluded that the evidence is insufficient to sustain the charge that respondent violated § 210.211, it follows that it has not been shown that he has violated the canons specified in the information. Accordingly, the information is dismissed.

MORGAN, Acting C. J., HOLMAN, BARDGETT, HENLEY and DONNELLY, JJ., and SIMEONE, Special Judge, concur.

SEILER, C. J., not sitting.